IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| CHRIS KELLY, JR.,<br><br>              Plaintiffs<br><br>vs.<br><br>JUDE PANNELL, TRAVIS NEELD, NILES MERCER, DOES 1-10, THE CITY OF IOWA CITY, IOWA and JOHNSON COUNTY, IOWA,<br><br>              Defendants. | NO. 3:21-CV-00021<br><br>**BRIEF IN SUPPORT OF CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**<u>CONFIDENTIAL</u>** |

Pursuant Local Rule 56(a)(2), Defendants Travis Neeld ("Officer Neeld"), Niles Mercer ("Det. Mercer") and the City of Iowa City, Iowa ("City"), collectively the "City Defendants" submit the following brief in support of their Motion for Summary Judgment in this matter. For the following reasons, the City Defendants respectfully request that the Court find there remains no genuine issue of material fact with respect to the claims asserted in Plaintiff's Complaint (Doc. 1) and that they be adjudicated in the City Defendants' favor as a matter of law.

I.    BACKGROUND ................................................................................................ 2

II.   ARGUMENT .................................................................................................... 8

    *A.   The Unconstitutionality of Mr. Kelly's Stop was Not Clearly Established (Count I)* .................................................. 9

    i.    Fourth Amendment Standards ........................................................... 9

    ii.   Qualified Immunity Standard for *Terry* Stops .................................. 11

    iii.  Officer Neeld Had Arguable Reasonable Suspicion ....................... 12

    iv.   Mr. Kelly's Detention and Arrest was Justified by the Evolving Facts ................................................................... 16

B.   Officer Neeld's Use of Force was Objectively Reasonable (Count II) ........................................................ 18

i.   Fourth Amendment Standards ................................................ 18

ii.  Officer Neeld's Force Was Objectively Reasonable ..................................... 19

iii. Officer Neeld is Entitled to Qualified Immunity on Mr. Kelly's Excessive Force Claim ................................... 20

C.   Civil Conspiracy (Count VI) .................................................. 23

D.   Mr. Kelly's State Assault & Battery Claim Must be Dismissed with his Excessive Force Claim (Count VIII) ............................... 23

E.   Mr. Kelly's False Arrest and False Imprisonment Claim Must be Dismissed with his Unlawful Stop and Seizure Claim (Count IX) ............................................... 24

F.   The City of Iowa City, Iowa is Not Liable for Any Alleged Wrongdoing of Officer Neeld or Detective Mercer. ......................... 26

i.   Defendant City of Iowa City Policies are Constitutional; and Officer Neeld and Detective Mercer were Properly Trained and Supervised. ........................... 28

ii.  The City policies ("directives") and customs in question are constitutional. ........................ 30

iii. The City properly trained and supervised Officer Neeld and Detective Mercer .............................. 31

III.  CONCLUSION ............................................................. 33

# I.   **BACKGROUND**

At approximately 1:40 pm on December 26, 2019, Assistant Johnson County Attorney Jude Pannell ("Mr. Pannell") had just concluded a shopping trip at the Waterfront Hy-Vee located at 1720 Waterfront Dr, Iowa City, Iowa. (SOUMF 4). Prior to beginning his shopping, Mr. Pannell had observed members of the Iowa City Police Department's Street Crimes Action Team ("SCAT Team") working on a car on the west side of the Waterfront Hy-Vee parking lot. (SOUMF 5). Upon concluding his shopping, Mr. Pannell left the Waterfront Hy-Vee, noticed that the SCAT Team was still in the area, and

proceeded to his vehicle where he began to leave the parking lot. (SOUMF 6). Mr. Pannell directed his vehicle to the west parking lot entrance on to Stevens Drive where he stopped at a stop sign to allow a pedestrian to cross in front of his vehicle. (SOUMF 7).

Mr. Pannell observed that the pedestrian was a black man with dreadlocks, a stocking cap, and a camouflage jacket which he described as being soft and pliant. (SOUMF 8). Although he could not remember his name, Mr. Pannell recognized the pedestrian as someone he'd encountered in his work as an assistant county attorney for Johnson County, Iowa. (SOUMF 9). Mr. Pannell later found out that he recognized the pedestrian, who was later revealed to be Mr. Kelly, because he'd prosecuted Mr. Kelly many times which included attending hearings and depositions with Mr. Kelly. (SOUMF 10). The male pedestrian also caught Mr. Pannell's attention because he was staring very intently in the direction of the SCAT Team. (SOUMF 11). Mr. Pannell also noticed that the male pedestrian was carrying something heavy with hard outlines in his right front jacket pocket that was heavy enough to weigh down the right side of the pedestrian's jacket several inches lower than the left and cause the right side of his jacket to swing back and forth as he walked. (SOUMF 12). It would later be revealed that Mr. Kelly was carrying a Jimenez Arms Model JA-LC380 in his front right pocket, which weighs 30 ounces per the firearm's specifications, equivalent to almost two (2) pounds. (SOUMF 13).

Mr. Pannell left the parking lot and turned west on Stevens Drive while continuing to observe the pedestrian in his review mirror who had his cellphone in his right hand near his face but not up against it. (SOUMF 14). Based on his observations and his experience with prosecuting firearm related cases, coupled with the fact that the pedestrian's cell phone was in his right hand, Mr. Pannell thought it possible that the object in the pedestrian's front right pocket could be a firearm. (SOUMF 15). This conclusion

concerned Mr. Pannell enough to call Officer Neeld and relay to him his observations of the male pedestrian. (SOUMF 16).

On December 26, 2019, Officer Neeld was assigned to routine patrol in the area of the Waterfront Hy-Vee when he received a call from the SCAT Team and the Johnson County Drug Task Force to have Officer Neeld bring his K9 partner to sniff around a vehicle in the parking lot of the Waterfront Hy-Vee. (SOUMF 17). While the K9 sniff was being completed, Officer Neeld received a call from Assistant Johnson County Attorney Jude Pannell who informed Officer Neeld that he'd observed a black male with dreadlocks and a camouflage jacket staring down Officer Neeld and the SCAT Team. (SOUMF 18). Mr. Pannell also described that he observed a heavy bulge in the male's right coat pocket that he thought might be a firearm. (SOUMF 19). Based on this information, Officer Neeld notified the members of the SCAT Team and they began attempts to locate the male Mr. Pannell had described. (SOUMF 20).

Detectives Mercer, Ties and Harding pulled into the Hy-Vee Gas Station at 260 Stevens Drive and observed a male matching the description provided by Mr. Pannell enter the store. (SOUMF 21). A short time later, Detective Ties observed the male exit the store and walk through the parking lot of the gas station in an eastern direction. (SOUMF 22). From their position, Detectives Ties, Mercer, and Harding were able to easily observe the male's right half of his body and noted that there was a heavy object in the right pocket of the male's camouflage jacket as evidenced by the fact the jacket was hanging lower in that pocket. (SOUMF 23). Detectives Ties, Mercer, and Harding then observed the male cross the street near the intersection of Stevens Drive and Waterfront Drive without using the crosswalk. (SOUMF 24).

4

At the same time as Detectives Ties, Mercer and Harding, Officer Neeld (in his vehicle) also observed the male and watched as the male walked off the sidewalk, onto the street, and walked directly in Officer Neeld's lane of traffic obstructing the street. (SOUMF 25). Officer Neeld then flagged down the male to ask him for some identification. (SOUMF 26). The male initially stated his name was "Marcus", but "Marcus" would not stop for Officer Neeld but continued to blade[1] his body away from Officer Neeld and indicated he was on his way to his "auntie's house." (SOUMF 27). Officer Neeld asked what "Marcus's" last name was as he intended to give him a warning for jaywalking. (SOUMF 28). "Marcus" indicated that his last name was "Kelly" and that he was from Chicago. (SOUMF 29).

Around this time Officer Neeld had indeed noticed the heavy bulge in "Marcus Kelly's" front right jacket pocket like what was previously described by Mr. Pannell. (SOUMF 30). Officer Neeld then asked "Marcus Kelly" if he had any identification from either Illinois or Iowa to which "Marcus Kelly" indicated he did not and that he had nothing on his person reflecting his name. (SOUMF 31). However, "Marcus Kelly" then inexplicably reached for the right side of his jacket which was concerning to Officer Neeld given that "Marcus Kelly" had just indicated he did not have identification and the right side was the side where the heavy object was spotted. (SOUMF 32). As a result of "Marcus Kelly's" movements, Officer Neeld briefly began to unholster his service weapon and advised "Marcus Kelly," saying, "please don't put your hands in your pocket...you said you don't have an ID and then you reach for your pocket," and that he was making

---

[1] "Blading" is the process by which someone never directly faces the other person but instead positions their body to keep one side of their body concealed from the other's view. (City Defs.' App. 215-216, Neeld Affidavit at ¶ 5; City Defs.' App. 213-214, Mercer Affidavit at ¶ 4; City Defs.' App. 218-219, Ties Affidavit at ¶ 4; City Defs.' App. 31-32, Harding Affidavit at ¶ 4).

Officer Neeld nervous ("Marcus Kelly's" jacket pockets were sagging significantly, and he was reaching in a direction that Officer Neeld could not view). (SOUMF 33). In response, "Marcus Kelly" pulled his hands up away from his waist. (SOUMF 34). "Marcus Kelly" then reached into his back pocket and pulled out his wallet which he opened enough for Officer Neeld to see a benefits card with the name "Chris Kelly." (SOUMF 35).

Officer Neeld then asked "Marcus Kelly" if his name was "Christopher Kelly" to which Mr. Kelly responded in the affirmative. (SOUMF 36). Officer Neeld recognized Mr. Kelly and called dispatch to determine if Mr. Kelly had any outstanding warrants. (SOUMF 37). Detective Mercer also recognized the name "Chris Kelly" and knew from past interactions that Mr. Kelly had a violent criminal history which prompted Detective Mercer to exit his police vehicle to assist Officer Neeld. (SOUMF 38). During Officer Neeld's conversation with dispatch, Mr. Kelly attempted to walk away, and Officer Neeld asked him to stay at almost the exact moment that dispatch advised there was a possible warrant for Christopher Kelly. (SOUMF 39). Officer Neeld advised Mr. Kelly that he had a possible warrant which prompted Mr. Kelly to become very nervous and uneasy while proclaiming he did not have a warrant. (SOUMF 40). Officer Neeld attempted to grab Mr. Kelly's arm, but he pulled away and continued to back away from Officer Neeld in an effort to run away. (SOUMF 41).

At this point additional officers from the SCAT Team arrived and grabbed Mr. Kelly's arms while Officer Neeld unholstered his taser. (SOUMF 42). Officer Neeld and the other officers gave repeated commands for Mr. Kelly to stop resisting and to get on the ground, but Mr. Kelly continued to resist officers and would not permit the SCAT officers to gain full control of his hands. (SOUMF 43). While Mr. Kelly was still standing and fighting with officers, Officer Neeld pointed his taser at Mr. Kelly's chest without firing

in an effort to get Mr. Kelly to comply but Mr. Kelly continued to resist the SCAT officers attempting to bring Mr. Kelly to the ground. (SOUMF 44). Once on the ground, Mr. Kelly continued to resist the SCAT officers' efforts to secure his hands prompting Officer Neeld to briefly discharge his taser into Mr. Kelly's lower left side rib cage. (SOUMF 45). When Mr. Kelly continued to resist officer commands, Officer Neeld then tased Mr. Kelly on his right leg as Mr. Kelly continued to try to pull away from SCAT officers' efforts to secure and handcuff Mr. Kelly's hands. (SOUMF 46). Mr. Kelly continued to physically resist the officers, which led Officer Neeld to deploy his taser for a third time to assist the SCAT officers in overcoming Mr. Kelly's resistance to having his hands brought together to be handcuffed. (SOUMF 47). Once Mr. Kelly's hands were finally secured by handcuffs, a SCAT officer searched Mr. Kelly's right coat pocket and located a handgun which Mr. Kelly initially denied was his, but later admitted that he carries the gun for his safety. (SOUMF 48). Once secured, Officers also located a container of marijuana on Mr. Kelly's person. (SOUMF 49).

On March 9, 2021, Mr. Kelly filed this action naming the City Defendants, along with several other governmental entities and public officials, as defendants in the case. Mr. Kelly's complaint originally alleged twelve claims including: unlawful stop and seizure (Count I), use of excessive force (Count II), racial profiling and racial discrimination (Count III), failure to intervene (Count IV), cover-up and malicious prosecution (Count V), civil conspiracy (Count VI), ratification, maintenance, and deliberate indifference (Count VII), assault and battery (Count VIII), false arrest and false imprisonment (Count IX), intentional infliction of emotional distress (Count X), negligent hiring, retention, supervision, and infliction of emotional distress (Count XI), and injunctive relief (Count XII). On October 14, 2021, the Court granted the collective defendants' partial motion to

dismiss but allowed Mr. Kelly to proceed with the following claims: unlawful stop and seizure (Count I), use of excessive force (Count II), civil conspiracy (Count VI), assault and battery (Count VIII), and false arrest and false imprisonment (Count IX). (ECF No. 25).

## II.    ARGUMENT

This Court has recently granted summary judgment to a law enforcement officer based on the undisputed facts and law regarding a use of force. *See Manning v. Ryan,* 4:18-cv-00254, 2020 WL 7074183 (S.D. Iowa, September 21, 2020). Whether the use of force is constitutionally excessive is a question of law. *See Swearingen v. Judd*, 930 F.3d 983 (8th Cir. 2019); *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015).   Similarly, whether a police officer is entitled to qualified immunity is a question of law, i.e., whether the law at the time of the December 26, 2019, incident was so clearly established so that a reasonable officer in Officer Neeld's or Detective Mercer's position would have known that they were violating Mr. Kelly's constitutional rights. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2008); *Peterson v. City of Plymouth*, 60 F.3d 469, 473, n. 6 (8th Cir. 1995).

Because Mr. Kelly has sued Officer Neeld and Detective Mercer in their individual capacities, the Court must apply the familiar qualified immunity analysis in determining whether his case may be summarily dismissed. *See, e.g., New v. Denver*, 787 F.3d 895 (8th Cir. 2015) (holding that denial of summary judgment on qualified immunity grounds was immediately appealable and reversing district court's denial of summary judgment); *L.G. through M.G. v. Columbia Public Schools*, 990 F.3d 1145 (8th Cir. 2021) (reversing district court rejection of school resource officer's request for qualified immunity and remanding for dismissal of Section 1983 claim).

To overcome Officer Neeld's or Detective Mercer's qualified immunity, Mr. Kelly has the burden to show "(1) a violation of his statutory or constitutional rights, and (2) that the right at issue was clearly established at the time of the Defendant's alleged misconduct." *Waters v. Madson,* 921 F.3d 725, 735 (8th Cir. 2019); *Columbia Public Schools*, 990 F.3d at 1147. A district court may take up either question first. *Columbia Public Schools*, 990 F.3d at 1147. In *Columbia Public Schools*, for example, the court opted to consider whether the rights allegedly violated by the school resource officer in that case were "clearly established." *Id.* "[U]nless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009).  Finally, the Supreme Court made the following observation in *County of Sacramento v. Lewis*:

> "[t] he police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance."

523 U.S. 833, 853 (1998) (citation omitted).

## A. *The Unconstitutionality of Mr. Kelly's Stop was Not Clearly Established (Count I)*

In his Complaint, Mr. Kelly asserts that Officer Neeld, Det. Mercer, and Mr. Pannell unlawfully stopped and seized him on December 26, 2019. (ECF No. 1, p. 14). The undisputed facts of record make clear that Officer Neeld unquestionably had arguable reasonable suspicion to at least make an investigatory stop of Mr. Kelly on December 26, 2019 and to extend that stop based upon the actions and responses of Mr. Kelly.

### i.   Fourth Amendment Standards

Absent a warrant, a seizure "must be supported by probable cause or reasonable suspicion." *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime." *Duhe v. City of Little Rock*, 902 F.3d 858, 862 (8th Cir. 2018) (citing *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)). "The arresting officer himself need not possess all of the available information; probable cause is assessed by the collective knowledge of the relevant officers and available objective facts." *Id.* (*citing United States v. Stratton*, 453 F.2d 36, 37 (8th Cir.)).

Where probable cause is lacking, a warrantless stop may still be constitutionally authorized "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30); *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014). A "hunch" is not enough. *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968). Courts look at the "'totality of the circumstances of each case to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). What the officer reasonably knew at the time of the seizure, not in hindsight, informs whether probable cause or reasonable suspicion existed. *See United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012). Indeed, the 8th Circuit Court of Appeals has reminded reviewing courts that the officer's observations must be reviewed as a whole and not in discrete and disconnected occurrences. *See Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019); *U.S. v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013) ("Even if a single factor identified

by the district court, when viewed in isolation, did not support a finding of reasonable suspicion, our precedent prohibits such a fragmented approach to reasonable suspicion.").

      **ii.**   Qualified Immunity Standard for *Terry* Stops

"Qualified immunity shields a government official from liability and the burdens of litigation unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Wright v. United States*, 813 F.3d 689, 696 (8th Cir. 2015). The purpose of the doctrine is to allow police officers "breathing room to make reasonable but mistaken judgments" in the oftentimes split-second execution of their duties, and to "protect[] all but the plainly incompetent or those who knowingly violate the law." *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014).

"To overcome qualified immunity, a plaintiff must allege (1) a violation of his statutory or constitutional rights, and (2) that the right at issue was clearly established at the time of the defendant's alleged misconduct." *Waters*, 921 F.3d at 735 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Id.* (citing *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013)). In applying the doctrine to stop and arrest challenges, the Eighth Circuit has stated that "an officer is entitled to qualified immunity if there is at least arguable probable cause to arrest." *Duhe*, 902 F.3d at 861. Likewise, where an officer is found to have "conducted an unlawful Terry stop, she may nonetheless be entitled to qualified immunity if she had *arguable* reasonable suspicion—that is, if a reasonable officer in the same position could have believed she had reasonable

suspicion." *Waters*, 921 F.3d at 736 (emphasis original) (citing *De La Rosa v. White*, 852 F.3d 740, 745-46 (8th Cir. 2017)).

### iii.    Officer Neeld Had Arguable Reasonable Suspicion

When Officer Neeld encountered Mr. Kelly on December 26, 2019, he reasonably believed that Mr. Kelly was engaged in criminal activity. Officer Neeld had received a call from Assistant County Attorney Jude Pannell ("Mr. Pannell") that a suspect he recognized from work was carefully eyeing nearby police engaged in street crime interdiction activity and appeared to have a heavy object in his coat pocket. (SOUMF 8-9, 11-12, 15-16). The source of this information cannot be overlooked.

The Supreme Court has directed courts to engage in a "totality-of-the-circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip…." *Illinois v. Gates*, 462 U.S. 213, 234 (1983). A key component of this analysis is a recognized distinction between "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" versus an unknown informant. *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *see also U.S. v. Kent*, 531 F.3d 642, 649 (8th Cir. 2008). This distinction is very important because information received from a known informant will more readily support a finding of reasonable suspicion whereas information received from an anonymous informant will require more in terms of independent police corroboration. *Gates*, 462 U.S. at 227.

The 8th Circuit Court of Appeals has also further broken-down known informants into reliable informants and unproven informants. *U.S. v. Williams*, 10 F.3d 590, 593 (8th

Cir. 1993). Reliable informants are individuals who have "a track record of supplying reliable information" to law enforcement. *Id.* Information from known reliable informants may be "sufficiently reliable to support a probable cause finding." *Id. See also U.S. v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (asserting "[t]he information form a [confidential reliable informant] is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information."). By comparison, unproven known informants are individuals without a track record of providing information to law enforcement. *Kent*, 531 F.3d at 649. "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Id.* When information is received from a known, but unreliable source, it requires independent verification to establish reliability which occurs when law enforcement corroborates the information by independent observation. *U.S. v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995).

Mr. Pannell was a known and reliable informant. In general, assistant county attorneys regularly work hand-in-hand with law enforcement to prosecute cases and address community criminal activity. (City Defs.' App. 34, Liston Affidavit at ¶ 6). The Johnson County Attorney's Office frequently shares information with the Iowa City Police Department and other area law enforcement agencies to assist in the location of witnesses or apprehension of criminal suspects. (City Defs.' App. 34, Liston Affidavit at ¶ 7). Throughout his career with the Iowa City Police Department, Officer Neeld often worked with Mr. Pannell as the prosecutor assigned to arrests made by Officer Neeld and the two would share information related to the prosecution of these files. (City Defs.' App. 215, Neeld Affidavit at ¶ 3). Officer Neeld also had no reason to believe that Mr. Pannell was unreliable given their work history and Mr. Pannell's ethical obligations of veracity

and truthfulness as an attorney. Officer Neeld was also aware that Mr. Pannell was experienced in prosecuting firearm related crimes and possessed more knowledge than the general public with respect the different ways an individual can carry a firearm. (City Defs.' App. 215, Neeld Affidavit at ¶ 4). In summary, there is no question that Mr. Pannell was known to Officer Neeld and other ICPD officers on December 26, 2019. It was also reasonable for Officer Neeld to trust Mr. Pannell's reliability given his position as an assistant county attorney and Officer Neeld's specific history with Mr. Pannell. This history, combined with the specific descriptions of Mr. Kelly's coat being weighed down by a heavy object and his suspicious actions towards nearby law enforcement on December 26, 2019, would have given any reasonable officer at least arguable reasonable suspicion to engage with Mr. Kelly.

If the Court determines that Mr. Pannell did not constitute a known and reliable informant on December 26, 2019, he nevertheless qualified as a known but unreliable informant whose information was sufficient to provide Officer Neeld with arguable reasonable suspicion to stop Mr. Kelly. Information from a known but unreliable source can nevertheless establish reasonable suspicion when the information is independently corroborated by law enforcement. *See e.g. Brown*, 49 F.3d at 1349. Mr. Pannell provided Officer Neeld with the physical description of Mr. Kelly, indicated that he recognized him from previous court interaction, indicated that Mr. Kelly was intently staring down nearby law enforcement, and appeared to have a heavy object in his coat pocket, that in Mr. Pannell's opinion, was likely to be a firearm. (SOUMF 8-9, 11-12, 15-16). Once Officer Neeld was able to locate Mr. Kelly, Officer Neeld then independently verified Mr. Kelly's physical description and also observed the heavy sagging of Mr. Kelly's coat pocket which was not Mr. Kelly's cell phone since his phone was in his hand at the time. (SOUMF 14-

14

15). This led Officer Neeld to believe that Mr. Kelly was carrying a firearm. In summary, Officer Neeld independently verified all of the information provided by Mr. Pannell and found all of said information to be accurate. Even if Mr. Pannell does not constitute a known and reliable informant, the information he provided was confirmed by Officer Neeld thereby lending support to Mr. Pannell's reliability and credibility. Under such circumstances, a reasonable officer would conclude that they had at least arguable reasonable suspicion to stop and speak with Mr. Kelly.

The information provided by Mr. Pannell, combined with Officer Neeld's own observations and training would have made any reasonable officer believe they had at least arguable reasonable suspicion to stop and speak with Mr. Kelly. At a minimum, Officer Neeld had to make a quick judgment call and there was no robust consensus in the law that would have put Officer Neeld on notice that his actions violated the rights of Mr. Kelly. Qualified immunity shields an officer who incorrectly resolves a fine-line, fact-intensive legal analysis on a moment's notice, so long as the officer's judgment was not foreclosed by clearly established precedent. The Eighth Circuit recently emphasized the particular protection qualified immunity affords in civil challenges to *Terry* stops:

> To be sure, on the merits, the existence of reasonable suspicion was a close question, because the facts on which [the officer] relied, taken together, did not raise as strong a suspicion [as analogous cases] . . . . In recent years, the Supreme Court has repeatedly reversed decisions denying qualified immunity where lower courts misunderstood the clearly established analysis. To avoid qualified immunity, [a plaintiff] must show a a robust consensus of cases of persuasive authority. Here, there is no consensus to be found in the prior decisions that have resolved a fact-intensive Fourth Amendment issue under a governing standard that requires judges to allow officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.

15

*De La Rosa,* 852 F.3d at 747 (internal quotations omitted). Here too, Officer Neeld drew on his own experience, specialized training, cumulative information, and the recommendation of a trusted law enforcement contact in developing a suspicion that Mr. Kelly was potentially carrying a concealed, unlawful weapon. At the heart of this matter, the facts observed by Officer Neeld give rise to at least an *arguable* reasonable suspicion and he is entitled to qualified immunity of Mr. Kelly's unlawful stop and seizure (Count I) claim.

### iv.   Mr. Kelly's Detention and Arrest was Justified by the Evolving Facts

Following the initial stop, Officer Neeld held Mr. Kelly in limited detention by asking questions aimed at determining Mr. Kelly's identity. Such questions do not exceed the scope of a *Terry* stop. *See United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010) ("Questioning a suspect about his or her identity is generally within the confines of a valid Terry stop."). Mr. Kelly's answers and conduct in response only increased the Officer Neeld's suspicion. In particular, Officer Neeld observed Kelly acting nervous and "blading" his right pocket away from the officer's view. (SOUMF 27). Mr. Kelly also gave an assumed name and denied having any form of identification on him—only to subsequently produce an identification card with a different name than he had initially provided. (SOUMF 31-32, 35). Mr. Kelly also gave inconsistent statements as to whether "Marcus" was his first or middle name. (SOUMF 26-27; City Defs.' App. 30, Neeld BWC Video at 13:46:44–13:47:04). "Traveling under an assumed name and failing to provide identification are factors that, taken in combination with other circumstances, can provide the necessary suspicion to expand the investigation." *Id.*

Once he learned Mr. Kelly's true name, Officer Neeld believed he recognized Mr. Kelly from prior investigations. Around this time, dispatch also alerted the officer to a "possible warrant" for Mr. Kelly's arrest based on the name that Officer Neeld stated out loud and Mr. Kelly confirmed. All of this information provided Officer Neeld with increased suspicion that Mr. Kelly was engaged in criminal conduct and justified his continued investigatory detention. It is immaterial that the possible warrant reported by dispatch was based on a misidentification.[2] *See Wright v. Bella Vista Police Dept.*, 452 F. Supp. 3d 830, 839 (W.D. Ark. 2020) (finding sufficient reasonable suspicion where officers "received information from the Arkansas Crime Information Center that there was a possible outstanding warrant issued" for a suspect); *see also Crenshaw v. City of Mount Vernon,* 372 F. App'x 202, 206 (2d Cir. 2010) ("An officer's reasonable belief in the existence of an outstanding warrant justifies an investigatory stop of a person while the warrant's existence is confirmed."); *United States v. Daniels*, 2014 WL 7781016, at *5 (N.D. Ga. Oct. 24, 2014) (holding that an officer advised of a possible probation warrant had reasonable suspicion to detain an individual).

When the other officers approached the scene and Mr. Kelly started to flee, reasonable suspicion for an investigatory stop increased to probable cause for an arrest.[3] Iowa Code section 719.1 provides that a "person commits interference with official acts when the person knowingly resists or obstructs anyone known by the person to be a

---

[2] In this case, any misidentification related to "Chris" v. "Christopher" Kelly which is a common shortening of the name "Christopher."

[3] Even if probable cause to arrest Kelly was lacking, Eighth Circuit precedent finds that a suspect's "argumentative, evasive, and uncooperative behavior" may justify increased restraint during an investigative detention. *See Waters*, 921 F.3d at 738 (citing *United States v. Bailey*, 417 F.3d 873, 877–78 (8th Cir. 2005)).

police officer." Federal courts have found that an attempt to flee from a stop by officers justifies arrest for interference with official acts. *See McElree v. City of Cedar Rapids, Iowa*, 372 F. Supp. 3d 770, 791 (N.D. Iowa 2019) ("[E]ven if the officers were not justified in conducting [a] *Terry* stop . . . they had probable cause to arrest Gossman for interference with official acts once he resisted and started to run."). Mr. Kelly's challenge to the reasonable suspicion for his initial investigatory stop cannot undermine the officers' authority to arrest, as both state and federal courts hold that "a [suspect's] response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." *United States v. Blackmon*, 662 F.3d 981, 985-86 (8th Cir. 2011); *see also State v. Dawdy*, 533 N.W.2d 551, 555 (Iowa 1995).

### B. *Officer Neeld's Use of Force was Objectively Reasonable (Count II)*

#### i. Fourth Amendment Standards

"The Fourth Amendment's objective reasonableness standard for arrestees governs excessive-force claims arising during the booking process." *Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011). Whether the use of force at issue is objectively reasonable is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Parrish v. Dingman*, 912 F.3d 464, 467 (8th Cir. 2019) (quoting *Graham*, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003). In making this assessment, a court may look to "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by

18

the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Zubrod v. Hoch*, 907 F.3d 568, 577 (8th Cir. 2018) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

### ii.   Officer Neeld's Force Was Objectively Reasonable

Use of a taser to incapacitate an arrestee, although generally considered non-lethal force, is a use of force subject to the fact-intensive objective reasonableness analysis. Nevertheless, as a general rule, "it is reasonable for an officer to tase an uncuffed suspect who appears to be resisting arrest." *McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020) (citing *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017)). The Eighth Circuit has handed down an abundance of cases permitting officers to use tasers on "noncompliant, violent suspects." *Franklin v. Franklin County, Arkansas*, 956 F.3d 1060, 1062 (8th Cir. 2020) (finding qualified immunity where officer used stun gun up to eight times on potentially violent arrestee, including three tases while arrestee was in handcuffs in isolation cell, resulting in arrestee's death). On the other hand, "where the suspect poses only a remote and theoretical threat to officer safety, and where the officers have not attempted to handcuff the suspect or otherwise execute an arrest," use of a taser to subdue the suspect is not objectively reasonable. *Orsak v. Metro. Airports Commn. Airport Police Dept.*, 675 F. Supp. 2d 944, 955 (D. Minn. 2009); *see also Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (finding officer's use of taser against uncooperative driver during traffic stop was not objectively reasonable where the driver posed a "minimal safety threat to [the] officers and was not actively resisting arrest or attempting to flee").

In this case, Officer Neeld deployed his taser in order to subdue Mr. Kelly, who

had attempted to flee from custody. Mr. Kelly was actively trying to pull away from the officers who seized his wrists, was argumentative, and refused Officer Neeld's instructions to "get on the ground." (SOUMF 43-44). Once on the ground, he continued to fight against the officers' restraint. (SOUMF 45-47). Mr. Kelly's lack of hand restraints presented a safety risk to officers, as they had observed a heavy object in his right pocket believed to be a gun. (SOUMF 48).  At least one officer felt Mr. Kelly pulling towards his right pocket. (City Defs.' App. 15, Ties Report at p. 1, ¶ 5 at ll. 8-11). These facts align with the established line of Eighth Circuit cases approving use of a taser to compel compliance from an actively resistant arrestee. *See Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 654 (8th Cir. 2019); *Zubrod v. Hoch*, 907 F.3d 568, 572, 580 (8th Cir. 2018); *Brossart v. Janke*, 859 F.3d 616, 625 (8th Cir. 2017). Officer Neeld applied his taser in three short spurts, and he stopped as soon as it became clear that Mr. Kelly would not continue to resist being handcuffed. (SOUMF 45-48). As such, Officer Neeld's use of force was coextensive with the officers' need to subdue Mr. Kelly and protect their own safety.

### iii.   Officer Neeld is Entitled to Qualified Immunity on Mr. Kelly's Excessive Force Claim

Even if the Court determines that Officer Neeld's use of force by tasing Mr. Kelly was not objectively reasonable, Officer Neeld is nevertheless entitled to qualified immunity on Mr. Kelly's excessive force claim. As generally outlined above, qualified immunity applies when "reasonable officers in the same position could have believed their conduct was 'lawful, in light of clearly established law and the information … officers possessed' at the time." *Waters*, 921 F.3d at 734-35 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The principle at the heart of this approach is that police officers

are liable only for transgressing bright lines, not for making bad guesses in gray areas. *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020).

Plaintiff bears the burden to show that any of Mr. Kelly's constitutional rights that were allegedly violated on December 26, 2019, were "clearly established." *Lewis v. City of St. Louis*, 932 F.3d 646, 648 (8th Cir. 2019). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brown v. City of Golden Valley,* 574 F.3d 491, 499 (8th Cir. 2009); *Swearingen v. Carle*, 286 F. Supp 3d 1014 (S.D. Iowa, Dec. 22, 2017) (finding it was not clearly established in January 2014 that an officer was forbidden to seize an individual when suddenly confronted in close quarters by a noncompliant person).

At the time of Mr. Kelly's arrest, no prevailing Eighth Circuit precedent would have put Officer Neeld on notice that his use of a taser on December 26, 2019 violated Mr. Kelly's Fourth Amendment Rights. Indeed, prevailing Eighth Circuit precedent at that time would have informed Officer Neeld that the brief use of his taser to subdue an unsecured and combative Mr. Kelly was perfectly reasonable and lawful. In *Broussart*, the Eighth Circuit found that the defendant officer's tasing of a violent, defiant arrestee five (5) times did not violate the Fourth Amendment. 859 F.3d  at 625. In *Franklin*, the Eighth Circuit found that the defendant officer was entitled to qualified immunity after using his taser eight times to subdue an uncooperative and violent suspect even though the suspect was a misdemeanant. 956 F.3d at 1062. The Eighth Circuit reached the same conclusion in *Zubrod* when the defendant officer tased the suspect up to ten times. 907 F.3d at 580. In *Rudley* the Eighth Circuit affirmed the defendant officer's use of his taser three (3) times and expressly rejected the plaintiff's citation to *Shekleton v. Eicheberger*, 677 F.3d 361 (8th Cir. 2012) because unlike the plaintiff in *Shekleton*, the plaintiff in *Rudley* was

combative and had ignored officer commands. 935 F.3d at 654. The Eighth Circuit concluded that based on the plaintiff's behavior and the information known to the defendant officer at the time, "a reasonable officer in [the defendant officer's] position could have believed that it was important to control the situation and to prevent a confrontation … that could escalate." *Id.* (quoting *Kelsay v. Ernst*, 933 F.3d 975, 981 (8th Cir. 2019).

The summary of cases immediately above makes it clear that the controlling precedent on December 26, 2019 would not have put Officer Neeld on notice that he was clearly violating Mr. Kelly's constitutional right to be free of excessive force. Mr. Kelly did not comply with Officer Neeld's commands for Mr. Kelly to put his hands on top of his head. (SOUMF 40). When Officer Neeld then attempted to make contact with Mr. Kelly to gain physical control, Mr. Kelly yanked his arm away and attempted to flee Officer Neeld and the other officers. (SOUMF 41). Mr. Kelly continued to resist officers who were unable to bring Mr. Kelly's arms behind his back to be handcuffed. (SOUMF 42-43). Mr. Kelly again refused Officer Neeld's commands to get on the ground even after Officer Neeld had pulled his taser and pointed it at Mr. Kelly. (SOUMF 44). Even once other officers were able to bring Mr. Kelly to the ground, he continued to resist and try to pull his hands away from officers. (SOUMF 45-47). This action was particularly concerning to officers who believed (correctly) that Mr. Kelly had a firearm in his jacket pocket. (SOUMF 48). Officer Neeld then immediately stopped tasing Mr. Kelly when he finally quit resisting officers and allowed his hands to be handcuffed. (SOUMF 47). These undisputed facts are remarkably similar to those in *Broussart*, *Franklin*, *Zubrod*, *and Rudley* and therefore nothing about Officer Neeld's taser deployment would have put him on notice that he was

violating Mr. Kelly's right to be free from excessive force on December 26, 2019. Officer Neeld is entitled to qualified immunity under the circumstances.

### C.  *Civil Conspiracy (Count VI)*

To establish a civil conspiracy claim, a plaintiff must prove that a particular officer conspired with others to deprive the plaintiff of a constitutional right; that at least one of the co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act did in fact injure the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Additionally, "[a] plaintiff is . . . required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 702 (8th Cir. 2020) (quoting *Askew*, 191 F.3d at 957).

If the Court finds that Officers Neeld and Mercer are not liable for Plaintiff's unlawful search and seizure (Count I) and excessive force (Count II) claims for the reasons argued above, then Plaintiff's civil conspiracy claim (Count VI) must be dismissed.  *see Henry v. Johnson*, 950 F,3d 1005, 1015 (8th Cir. 2020) (affirming grant of summary judgment on § 1983 civil conspiracy claim where plaintiff failed to establish a constitutional deprivation); *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir. 1984) ("[I]t remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient. ... Without a deprivation of a constitutional right or privilege, [the defendant] has no liability under § 1983.").

### D.  *Mr. Kelly's State Assault & Battery Claim Must be Dismissed with his Excessive Force Claim (Count VIII)*

Plaintiff appears to conflate his claim that the Defendant Officers used excessive force with a common law assault and battery claim. Iowa does not recognize the tort of

excessive force. *See Daniels v. Tyler*, 56 F.Supp.3d 967, 972–76 (N.D. Iowa 2014) (citing various cases supporting the proposition). Nor does Iowa Code § 804.8 create a private cause of action. *Id.* Rather, under § 804.8, a police officer, while making a lawful arrest, is justified in the use of any force which the officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest. Consequently, police officers are privileged to commit a battery pursuant to a lawful arrest subject to the limitation on excessive force in § 804.8. *Id.* The standard by which the use of force is evaluated is "objective reasonableness," which is the same standard applied under the Fourth Amendment in determining the reasonableness of force. *Id*; *see Johnson v. Civil Serv. Comm'n of City of Clinton*, 352 N.W.2d 252, 257 (Iowa 1984) ("[A]n assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances.").

Since the defendants are entitled to summary judgment on the excessive force claim raised pursuant to § 1983, and the same claim under state law is evaluated under the same "objective reasonableness" standard, defendants are entitled to summary judgment on this claim.

### E. *Mr. Kelly's False Arrest and False Imprisonment Claim Must be Dismissed with his Unlawful Stop and Seizure Claim (Count IX)*

The claim of false arrest under Iowa law "has two elements: (1) detention or restraint against one's will, and (2) unlawfulness of the detention or restraint." *Baldwin v. Estherville, Iowa,* 218 F.Supp.3d 987, 1003 (N.D. Iowa 2016) (citations omitted) (granting summary judgment to Defendant City and officers on false imprisonment claim where it was also found that the underlying seizure was constitutional).

A person may not resist even an unlawful arrest by a known peace officer. *See*

24

Iowa Code § 804.12 ("A person is not authorized to use force to resist an arrest . . . even if the person believes that the arrest is unlawful or the arrest is in fact unlawful."); *see also United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995); *State v. Thomas*, 262 N.W.2d 607, 611 (Iowa 1978) (holding that "a person may not resist an arrest reasonably effected by one whom the arrestee knows or has good reason to know is a peace officer, despite the legality or illegality of the arrest"). Moreover, the law in Iowa makes it illegal for a person to "knowingly resist[ ] or obstruct[ ] anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer." Iowa Code § 719.1. "Iowa law allows peace officers to make warrantless arrests for "public offenses," which include municipal ordinances with a penalty of a fine or imprisonment." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105–06 (8th Cir. 2004) (citation omitted) (granting summary judgment to Defendant City and officers on state law claims for negligence, assault and battery and intentional infliction of emotional distress). This authorization is codified at Iowa Code § 804.7(3) (2022) which allows a peace officer to make an arrest without a warrant "[w]here the peace officer has reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person to be arrested has committed it." An arrest is lawful if there was probable cause to believe the subject had violated any applicable statute, even one not contemplated by the officers at the moment of arrest. *Lawyer*, 361 F.3d at 1105–06 (citations omitted).

Officer Neeld and Detective Mercer incorporate all arguments set out in Sections A and B above regarding Mr. Kelly's § 1983 and state constitutional tort claims based upon Defendants' warrantless arrest of Mr. Kelly. It is clear from the evidence of those involved that the Defendant Officers had at least arguable reasonable suspicion to initially

stop and detain Mr. Kelly. As the investigation developed in front of the Waterfront Hy-Vee, the officers learned additional facts and developed further legal justification to order Mr. Kelly to put his hands on his head.

The undisputed facts further establish that Mr. Kelly gave officers probable cause to arrest him when, at a minimum, he gave false information to police officers who were identifiable as officers, refused their lawful commands, attempted to flee the area, physically struggled with Officer Neeld and other officers, and continued to pull his hands away from officers even while being tased. (SOUMF 27-29, 31-32, 35-36, 40-47.) These facts, taken together with the facts recited in those sections incorporated herein by reference, establish that Officer Neeld had probable cause to arrest Mr. Kelly and that his own illegal conduct defeats the false arrest claim. Defendants are entitled to judgment as a matter of law.

### F. *The City of Iowa City, Iowa is Not Liable for Any Alleged Wrongdoing of Officer Neeld or Detective Mercer.*

In his Complaint, Plaintiff makes claims for assault and battery (Count VIII) and false arrest and false imprisonment (Count IX) against all defendants which includes the City of Iowa City, Iowa ("City") under the doctrine of respondeat superior. (ECF No. 1, pp. 26-27). Mr. Kelly does not make any specific claims against the City but merely asserts that Officers Neeld and Mercer were acting withing the scope of their employment during their interaction with Mr. Kelly on December 26, 2019. (ECF No. 1, ¶¶ 108 and 112). Under Iowa law, Mr. Kelly's respondeat superior claims against the City necessarily fail because "one of the limitations of the respondeat superior doctrine is that the employer has no liability unless the employee is liable." *Dickens v. Associated Anesthesiologists, P.C.*, 709 N.W.2d 122, 125 (Iowa 2006). *See also* Iowa Code § 670.4(1)(c) (2022) (no municipal liability where the employee "exercises due care in the execution of a statute").

In *Parrish v. Dingman*, the plaintiff asserted claims of assault and battery and respondeat superior against the employer defendant, Hamilton County, Iowa. 912 F.3d 464 (8th Cir. 2019). The district court dismissed the plaintiff's assault and battery claims on the basis of § 804.8 of the Iowa Code, which permits a law enforcement officer to use reasonable force to effect an arrest. *Id.* at 469. The 8th Circuit readily affirmed the dismissal of the plaintiff's assault and battery claims, finding that Iowa courts generally apply an objective reasonableness standard when reviewing § 804.8 and having found that the defendant officer's use of force was objectively reasonable, summary judgment was appropriate. *Id.* (citing *Chelf v. Civil Serv. Comm'n of Davenport*, 515 N.W.2d 353, 355-56 (Iowa Ct. App. 1994)); *Lawyer v. City of Council Bluffs*, 240 F.Supp.2d 941, 953 (S.D. Iowa 2002). Having affirmed that summary judgment was appropriate on the plaintiff's assault and battery claims, the 8th Circuit further affirmed that the plaintiff's respondeat superior claim must necessarily fail. *Id.* (citing *Dickens*, 709 N.W.2d at 125).

The same cascade of rulings that was applicable in *Parrish v. Dingman* is applicable here. Pursuant to sections D and E above, Mr. Kelly's assault/battery (Count VIII) and false arrest/imprisonment (Count IX) claims against Officer Neeld and Detective Mercer fail as a matter of law. The failure of Mr. Kelly's assault/battery and false arrest/imprisonment claims against Officer Neeld and Detective Mercer individually necessitates a finding that the City cannot be held liable under the doctrine of respondeat superior. *See Dickens*, 709 N.W.2d at 125 (citing *Peppermeier v. Murphy*, 708 N.W.2d 57, 63-64 (Iowa 2005). Summary judgment is appropriate on Mr. Kelly's respondeat superior claims.

Although it seems clear that Mr. Kelly is relying on a theory of respondeat superior to support his claim for municipal liability on his assault and battery (Count VIII) and false

27

arrest and false imprisonment (Count IX) claims, to the extent Mr. Kelly is asserting some type of *Monell* argument, it necessarily fails as well. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691, 694 (1978); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduction of their subordinates under a theory of respondeat superior").

If the Court finds that Officer Neeld and Detective Mercer are not liable for any Fourth Amendment violations, any alleged *Monell* claim against the City must be dismissed. *Sinclair v. City of Des Moines, Iowa*, 268 F.3d 594, 597 (8th Cir. 2001) ("Because the police officers are absolved of liability, the City cannot be held liable for their actions."). *See also Veneklase v. City of Fargo*, 248 F.3d 738, 748 (8th Cir. 2001) (en banc); *Olinger v. Larson*, 134 F.3d 1362, 1367 (8th Cir. 1998) ("The City cannot be liable…whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim.") (quoting *Abbott v. City of Crocker*, 30 F.3rd 994, 998 (8th Cir. 1994)).

Moreover, even if the Court were to find a genuine issue of material fact as to the constitutionality of the underlying conduct on the part of Officer Neeld, the City is not liable.  Under the long-standing principles established in *Monell*, municipalities are not liable upon claims brought pursuant to 42 U.S.C. § 1983 merely because the municipality employs the tortfeasor(s). *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 992–93 (8th Cir. 2015).  In other words, to be found liable for a constitutional claim, Plaintiffs must, but in this case cannot, establish the City's conduct in its own right offends the constitution.

> **i.** **Defendant City of Iowa City Policies are Constitutional; and Officer Neeld and Detective Mercer were Properly Trained and Supervised.**

Count I alleges violation of the Fourth Amendment to the United States Constitution, as enforced through 42 United States Code section 1983, and Article I, Section Eight, of the Iowa Constitution. (ECF No. 1, p 14). Count II alleges excessive force violations of the same authority. (ECF No. 1, p.16).  Mr. Kelly makes no reference to any City policies, practices, customs and/or procedures or training/supervision failures in Count I or Count II of his Complaint. *Id.* As set out below, given the undisputed factual record, all such claims fail as a matter of law.  To establish municipal liability in Counts I and II, Mr. Kelly must show: one or more relevant municipal policies are unconstitutional on their face; "a facially lawful municipal action has led an employee to violate a plaintiff's rights;" or "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008) (citing *Szabla v. City of Brooklyn Park,* 486 F.3d 385 (8th Cir. 2007)). The undisputed record facts, established by extensive discovery, reveal Mr. Kelly's inability to show an unconstitutional policy or custom as addressed in Section F(ii) below or a failure to train or failure to supervise as addressed in Section f(iii) below.  Relevant to both discussions is the undisputed fact that in accordance with its own official directives, ICPD trains all its patrol officers (i.e., following completion of academy and certification as peace officers), as well as its investigators and command staff in all ICPD policies (otherwise known as directives) and procedures, including those related to legal cause, use of force, and all other aspects of law enforcement operations. (City Defs.' App. 34, Liston Affidavit at ¶ 5). Also undisputed is the fact that beyond the City imposing general training requirements for all sworn peace officers and ensuring they are met, Officer Neeld and Detective Mercer completed numerous hours of advanced training and/or specialized training. (City Defs.' App. 34-35, Liston Affidavit at ¶¶ 9-15).

ii.     ***The City policies ("directives") and customs in question are constitutional.***

Assuming without conceding Mr. Kelly survives summary judgment on one or both of Counts I and II, Mr. Kelly still cannot prevail on either Count because "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *See Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007) (affirming summary judgment in favor of city defendant where plaintiff failed to present any evidence of an official policy or widespread custom that resulted in his injuries). Nothing in the record suggests any directive (i.e., policy) that is either unconstitutional on its face or, though constitutional on its face, somehow directs, causes or leads ICPD officers to violate the constitutional rights of individuals with whom they come in contact. Having been provided with all ICPD directives requested, and then some, Mr. Kelly cannot point to a single ICPD Directive, or even a single line in any one of those Directives, that is either unconstitutional on its face or otherwise has caused or led Officer Neeld or Detective Mercer to violate Mr. Kelly's constitutional rights.

Regarding Mr. Kelly's claims of an unconstitutional custom on the part of the City, the 8th Circuit has provided guidance concerning the required showing:

> To establish a claim for "custom" liability, [Plaintiff] must demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014). Plainly stated, the undisputed record contains not even a scintilla of evidence to support a claim that the City

had or has a continuing, widespread, persistent pattern or practice to support a claim of unconstitutional custom.  As matter of law, Mr. Kelly's claims against the City based upon an unconstitutional policy or custom, to the extent they've been pled, are without merit, and the City is entitled to summary judgment on these aspects of Counts I and II of Mr. Kelly's Complaint.

### iii.   *The City properly trained and supervised Officer Neeld and Detective Mercer*

On the issue of failure to train as a basis for municipal liability, the *Snider* Court is also instructive:

> The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.

*Snider,* 752 F.3d at 1160 (8th Cir. 2014).

As pointed out above, the undisputed record evidence establishes the City extensively trains its police officers, and the record includes no indication whatsoever that the City or Officer Neeld or Detective Mercer have ever been indifferent to anyone's legal rights, much less deliberately indifferent.  *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir.2008). There is no factual basis to support the assertion the City or the ICPD failed to adequately train their officers on applicable ICPD Directives, including but not limited to the use of force and search techniques. (City Defs.' App. 34-35, Liston Affidavit at ¶¶ 9-15). To the contrary, there is ample record evidence reflecting the City requires extensive training on all aspects of policing.

Similarly, Mr. Kelly cannot point to any evidence to suggest the City had prior notice of inadequate training with respect to use of force and searches and seizures. The only evidence of record establishes it did not. (City Defs.' App. 34-35, Liston Affidavit at ¶¶ 9-

15).   Without notice of inadequate training, there is no basis to find the City was "deliberately indifferent" such/or that the extensive training provided to Iowa City police officers would result in "a violation of a particular constitutional or statutory right."  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1217 (8th Cir. 2013) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 411 (1997)).

The Eighth Circuit has stated "a claim for failure to supervise requires the same analysis as a claim for failure to train."  *Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir. 2007) (citing *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998)); *see also Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018) (granting summary judgment to defendant city on Plaintiffs' § 1983 claims).

Neither a failure to train claim nor a failure to supervise claim can survive summary judgment without at least *some* evidence the municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]."  *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010).  As to both Count I and II of Mr. Kelly's Complaint, he can put forth nothing other than *post-hoc* personal opinions about how the City via ICPD should have trained and supervised Officer Neeld/Detective Mercer or how Officer Neeld/Detective Mercer should have implemented their training during the rapidly-evolving events of December 26, 2019.

The law makes it clear that the City must have "notice that its policies and procedures were inadequate and likely to result in a violation of constitutional rights." *Otey*, 121 F.3d at 1156.  As a matter of law, to the extent Mr. Kelly has pled and alleged failure to train and failure to supervise Officer Neeld and Detective Mercer, the claims are without merit, and City Defendants are entitled to summary judgment on these aspects of Count I and II of Plaintiffs' Complaint.

32

### III.   <u>CONCLUSION</u>

Trial of this matter is unnecessary. For the reasons set forth above, there remain no genuine issues of material fact precluding the Court's adjudication of this case. Officer Neeld and Detective Mercer and the City of Iowa City are entitled to judgment as a matter of law. Therefore, the City Defendants respectfully request that the Court grant their Motion for Summary Judgment, deny all relief sought by Mr. Kelly in this case, dismiss his Complaint, and tax costs appropriately.

/s/ Wilford H. Stone
Wilford H. Stone, AT0007699
Daniel M. Morgan, AT0013452

**LYNCH DALLAS, P.C.**
526 Second Avenue SE
P.O. Box 2457
Cedar Rapids, Iowa 52406-2457
Telephone (319) 365-9101
Facsimile (319) 365-9512
E-Mail:  wstone@lynchdallas.com
E-Mail:  dmorgan@lynchdallas.com

ATTORNEYS FOR OFFICER NEELD AND DETECTIVE MERCER

/s/ Liz Craig
LIZ CRAIG, AT0008972
SUSAN DULEK, AT0002217
**CITY OF IOWA CITY**
410 E. Washington St.
Iowa City, Iowa 52240
Telephone: 319-356-5000
E-Mail: Liz-Craig@iowa-city.org
E-Mail: Sue-Dulek@iowa-city.org

ATTORNEYS FOR DEFENDANT CITY OF IOWA CITY

## CERTIFICATE OF SERVICE

I certify that I served this document upon the following person(s) by electronic mail pursuant to Federal Rule of Civil Procedure 5 on the 28th day of July, 2022.

Aaron Page
Clark Grove PLLC
512 Clark Street
Iowa City, IA 52240
aaron@clarkgrove.com

Kristopher K. Madsen
Robert M. Livingston
Stuart Tinley Law Firm LLP
300 West Broadway, Ste. 175
Council Bluffs, IA 51503
madsen.kristopher@stuarttinley.com
robert.livingston@stuarttinley.com

Rockne Cole
Cole Law Firm, PC
209 E. Washington, Ste. 304
Iowa City, IA 52240
rocknecole@gmail.com

/s/Wilford H. Stone